```
                        SUMMONS ON COMPLAINT
              Court of Common Pleas,  SENECA   County, Ohio
                  Jean A. Eckelberry   Clerk of Courts
-------------------------------------------------------------------------------
  CARSON CORPORATION            v PRECISION PIPELINE LLC              18-CV-0144
-------------------------------------------------------------------------------
         CARSON CORPORATION           , Plaintiff
         171 RT 94
         LAFAYETTE        NJ 07848



  To:    PRECISION PIPELINE LLC       , Defendant
         Stat Agent: Corp Service Co
         50 W Broad St, Ste 1330
         Columbus        OH 43215

-------------------------------------------------------------------------(02)
  To the following named defendants:

      PRECISION PIPELINE LLC

  You have been named defendant(s) in a complaint filed in:
            SENECA    County Court of Common Pleas
               103 E. Market St.,Suite 101
               Tiffin, OH  44883

  by: CARSON CORPORATION            Attorney: DOUGLAS    C GRAY        (0088604)
                                              3011 WATERFALL WAY
                                              WESTLAKE        OH 44145
                                    ---------------------------------------------
```

plaintiff(s).  A copy of the complaint is attached.

You are hereby summoned and required to serve upon the plaintiff's attorney (or upon the plaintiff, if he has no attorney of record) a copy of an answer to the complaint within twenty-eight days after service of this summons on you, exclusive of the day of service. A copy of your answer must also be filed with the Court within three days of your serving your answer upon the plaintiff or upon the plaintiff's attorney.

If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded.

Date:   6/13/18                        Jean A. Eckelberry   , Clerk of Courts

                              By  _____ , Deputy Clerk

## IN THE COURT OF COMMON PLEAS, SENECA COUNTY, OHIO

| | |
|---|---|
| **Carson Corporation,** : | Case No: _18CV0144_ |
| : | |
| Plaintiff, : | Honorable:  JUDGE STEVE C. SHUFF |
| : | |
| v. : | **COMPLAINT WITH JURY DEMAND** |
| : | |
| **Precision Pipeline, LLC,** : | Douglas C. Gray (Ohio Bar No. 0088604) |
| 3314 56th Street : | **Morris, Downing & Sherred, LLP** |
| Eau Claire, WI 54703 : | One Main Street |
| : | Main Address: Newton, New Jersey 07860 |
| **Statutory Agent:** : | ph. 973-383-2700 |
| **Corporation Service Company** : | Ohio Address: 3011 Waterfall Way |
| **50 W. Broad St., Ste 1330** : | Westlake, OH 44145 |
| **Columbus, OH 43215** : | ph. 646-338-2711 |
| : | dgray@mdsfirm.com |
| Defendant. : | |
| : | *Attorneys for Plaintiff* |

### Parties, Jurisdiction and Venue

1.      Plaintiff Carson Corporation ("Plaintiff" or "Carson") is a for-profit corporation organized and existing pursuant to the laws of the State of New Jersey having a principal address at 171 Route 94, Lafayette, New Jersey 07848.  Carson is authorized to transact business in the State of Ohio.

2.      Defendant Precision Pipeline, LLC ("Defendant" or "Precision") is a limited liability company organized and existing pursuant to the laws of the State of Wisconsin having a principal address at 3314 56th Street, Eau Claire, Wisconsin 54703.

3.      This action concerns certain work done by Carson as a horizontal directional drilling subcontractor on the Wolf Creek crossing section of an interstate pipeline project for which Precision serves as general contractor.

4.     The Wolf Creek section of the project where Carson's work was performed is located in Seneca County, Ohio.

5.     Venue is accordingly proper pursuant to Ohio R. 3(B)(3) & (6).

### Background Facts Common to All Causes of Action

6.     The Rover Pipeline project is a 713-mile interstate pipeline designed to transport natural gas from production facilities/areas to markets throughout the United States and in Canada.

7.     As part of the Rover Pipeline project, Energy Transfer Co. (the "Owner"), entered into a contract with Precision to perform the installation and construction of pipeline in various counties in Ohio, Michigan and West Virginia (the "Prime Contract").

8.     On or about March 30, 2017, Precision and Carson entered into a Subcontractor Agreement (the "Subcontract") pursuant to which Carson agreed to provide various horizontal directional drilling services and materials to Precision in furtherance of the Prime Contract. (A true and correct copy of the Subcontract is annexed hereto as Exhibit "A.")

9.     The scope of work covered by the Subcontract included a pair 1,752-foot direction drills identified as "Wolf Creek crossing" which is located in Seneca County, Ohio.

10.    In or around April 2017, Carson mobilized on site to begin work on the Wolf Creek crossing.

11.    As Carson was initiating operations, three areas of work were identified that were outside the scope of the Subcontract and which required change orders (the "Change Orders"): (i) mud disposal at the pre-agreed price of $250 l/f (ultimately totaling $437,500); (ii) costs associated with Carson staffing laborers as 24/7 guards at the pre-agreed price of $3,900 per day

-2-

(totaling $175,500); and (iii) a unitary charge at the pre-agreed price of $200,000 for "double-shifting" the horizontal directional drilling work on the job.

12.     In accordance with applicable Subcontract provisions, written Change Orders were submitted for all of this work and each component change was specifically approved in writing by representatives of Precision having due authority.  (True and correct copies of the Change Orders are attached hereto as Exhibit "B.")

13.     No objection was ever made by Precision or the Owner to the work furnished pursuant to the Change Orders, all of which was (i) performed in a professional and workmanlike manner, (ii) performed in a manner consistent with the relevant contract documents, and (iii) incorporated into the completed project.

14.     On or about August 1, 2017, Carson submitted to Precision a payment application (entitled "Payment Application 3 - Change Orders") seeking the payment of the $813,000.00 incurred by Carson in connection the pre-approved Change Order work.  (A true and correct copy of this payment application is annexed as Exhibit "C.")

15.     Carson has made repeated demand for payment of Payment Application 3 - Change Orders, but Precision has refused to remit payment.

16.     Upon information and belief, Precision has been paid in full by the Owner for the services and materials reflected in the Change Orders, including with respect to any retainage amounts.

### First Claim
### (Breach of Contract)

17.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 16 above.

-3-

18.     Plaintiff has performed all of its obligations under the Subcontract, as modified by the Change Orders.

19.     Defendant has breached the Subcontract, as modified by the Change Orders, by refusing to remit payment for Payment Application 3.

20.     Plaintiff has suffered damages as a direct and proximate result of Defendant's breaches of contract.

### Second Claim
### (Breach of Contract)

21.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 16 above.

22.     In the alternative to the First Cause of Action, the Change Orders, either individually or collectively, constitute separable and enforceable agreements for the provision of the services and materials described therein.

23.     Plaintiff has performed all of its obligations under the Change Orders.

24.     Defendant has breached the Change Orders, by refusing to remit payment for Payment Application 3.

25.     Plaintiff has suffered damages as a direct and proximate result of Defendant's breaches of contract.

### Third Claim
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

26.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 25 above.

27.     The Subcontract and/or Change Orders constitute one or more contracts to be performed in the State of Ohio to which the implied covenant of good faith and fair dealing attaches.

-4-

28. Defendant breached the implied covenant of good faith and fair dealing by refusing to remit payment for Payment Application 3 despite Defendant's prior approval of the Change Orders and its acceptance of the work encompassed therein.

29. Plaintiff as suffered damages as a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing.

## Fourth Claim
### (Prompt Pay Act – ORC 4113.61)

30. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 29 above.

31. ORC § 4113.61 requires a construction contractor performing work in the State of Ohio to make payment to a subcontractor within 10 days of the contractor's receipt of payment for the covered work.

32. Upon information and belief, Defendant submitted one or more applications for payment to the Owner for the work reflected in the Change Orders.

33. Upon information and belief, Defendant was long since paid by the Owner on such applications, including the full amount of any retainage.

34. Plaintiff has been damaged by Defendant's failure to pay it in a timely manner as mandated by ORS § 4113.61.

## Fifth Claim
### (Quasi-Contract – Quantum Meruit)

35. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 16 above.

36. To the extent that the Change Order work is deemed outside the scope of the Subcontract and/or the Change Orders do not constitute separable enforceable agreements, Carson's performance of the Change Order work nevertheless conferred a benefit upon

-5-

Precision, Precision had knowledge of that benefit, and Precision retained the benefit under circumstances in which they knew Carson expected remuneration and it would be unjust for Precision to retain the benefit without providing payment therefore.

37.     Plaintiff has suffered damages as a direct and proximate result of Precision's improper retention of the benefit of the Change Orders work without compensation therefore and is accordingly entitled to the reasonable value of the services and materials rendered pursuant to the Change Orders.

## Sixth Claim
### (Quasi-Contract – Unjust Enrichment)

38.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 16 above.

39.     To the extent that the Change Order work is deemed outside the scope of the Subcontract and/or the Change Orders do not constitute separable enforceable agreements, Carson's performance of the Change Order work nevertheless conferred a benefit upon Precision, Precision had knowledge of that benefit, and Precision retained the benefit under circumstances in which they knew Carson expected remuneration and it would be unjust for Precision to retain the benefit without providing payment therefore.

40.     Plaintiff has suffered damages as a direct and proximate result of Precision's improper retention of the benefit of the Change Orders work without compensation therefore and is accordingly entitled to the value of the benefit conferred upon Precision thereby.

## Seventh Claim
### (Promissory Estoppel)

41.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 16 above.

42.     Defendant made a clear and unambiguous promise to Plaintiff, namely that it would compensate Plaintiff for the Change Order work in the amounts stated and that Plaintiff should therefore proceed with such work.

43.     Plaintiff relied upon those promises in a reasonable and foreseeable manner by performing the work covered by the Change Orders.

44.     Plaintiff has suffered damages as a direct and proximate result of that reasonable and foreseeable reliance.

**WHEREFORE,** Plaintiff demands judgment against Defendant in an amount in excess of $25,000 for all causes of action set forth above; interest at the rate of 18% from the date 11 days after Precision received payment for the Change Order work from the Owner pursuant to the Fourth Claim and Ohio's Prompt Pay Act, ORC § 4113.61; attorneys' fees and disbursements pursuant to the Fourth Claim and Ohio's Prompt Pay Act, ORC § 4113.61; punitive damages and/or attorneys' fees and disbursements as otherwise permitted by law; interest and costs; and such other relief as justice requires or as this Court sees fit under controlling principles of law and equity.

**MORRIS, DOWNING & SHERRED, LLP**

By: _____
        Douglas C. Gray (0088604)

Attorneys for Plaintiff Carson Corporation

Dated: June 11, 2018

-7-

## **JURY DEMAND**

Plaintiff hereby demands trial by jury of all issues so triable.

MORRIS, DOWNING & SHERRED, LLP

By: _____
       Douglas C. Gray (0088604)

Attorneys for Plaintiff Carson Corporation

Dated: June 11, 2018

# EXHIBIT "A"

## SUBCONTRACTOR AGREEMENT

**Agreement No.**
**17-RVR-11**

**Job No.**
**17-RVR**

AGREEMENT dated as of the Effective Date between the contractor Precision Pipeline, LLC, a Wisconsin limited liability company ("Contractor") and Carson Corporation ("Subcontractor").

### WITNESSETH:

WHEREAS Contractor has entered into a contract with Energy Transfer Co. ("Owner") to perform the construction and installation of a crude oil pipeline in Carrol, Tuscarawas, Stark, Wayne, Ashland, Richland, Crawford, Seneca, Hancock, Wood, Henry, Defiance, Fulton, Monroe, Noble, Belmont Counties in Ohio; Lenawee, Washtenaw, and Livingston Counties in Michigan; and Marshall, Doddridge, Tyler, Wetzel Counties in West Virginia (the "Project") pursuant to plans and specifications prepared by the Architect/Engineer, or the Owner, in accordance with the Project Schedule.

WHEREAS, Contractor desires to engage Subcontractor and Subcontractor desires to be so engaged upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and for other valuable consideration acknowledged by each of the parties to be satisfactory and adequate, the parties covenant and agree as follows:

In consideration of the mutual covenants and promises contained in this Agreement, Contractor and Subcontractor agree as follows:

1.  Scope of Work. Subcontractor will perform the scope of work ("Scope of Work" or "Work") as Contractor's subcontractor in support of Contractor's contract with Owner ("Primary Contract") at the Primary Contract Location, all as described on Schedule 1. Subcontractor will perform the Work in accordance with the terms of this Agreement which shall include the payment for and supply of all labor, tools, equipment, appliances and other materials necessary to comply with this Agreement and to complete all work necessary or incidental to the portion of the Work described in Schedule 1. Subcontractor will pay all labor, including, if necessary, union benefits and fringes, materials, equipment, tools and appliances used in connection with the performance of this Agreement as they become due, and to protect the Project, Owner and Contractor from all claims and mechanics' liens on account thereof and to furnish evidence thereof satisfactory to Contractor, if required. This change is not a waiver of Subcontractor's right to file a lien against Owner. Subcontractor also will perform work in accordance with the Primary Contract, the terms of which are incorporated into this Agreement by reference to the extent not inconsistent with the terms of this Agreement. In the event of any inconsistency between this Agreement and Primary Contract, the terms of this

SUBCONTRACTOR INITIALS

Agreement will govern.

2.  Subcontractor's Warranty. Subcontractor shall perform the work in a first class, workmanlike manner in strict accordance with the requirements of the Primary Contract. Subcontractor will exercise the same degree of care, skill and diligence in the performance of the Work as is ordinarily exercised by other subcontractors in the industry, but in any event not less than is required of Contractor under the Primary Contract. Subcontractor warrants (a) that the Work complies with all diagrams, drawings, plans, specifications and other documentation, information or requirements regarding the Work under the Primary Contract ("Specifications") and that it is free of all deficiencies and defects in workmanship, and (b) that all materials or equipment supplied by Subcontractor comply with all Specifications and are new and fit for their intended purposes, unless otherwise described in the Specifications. Neither issuance of a final certificate of occupancy, as applicable, nor payment, nor inspections of the work by Contractor or Owner, shall relieve Subcontractor of its responsibilities under this Agreement. Subcontractor warrants the Work performed by Subcontractor to Contractor and Owner for a period of one (1) years from substantial completion. Subcontractor will immediately repair or replace any defective Work or materials or equipment that in Contractor's or Owner's judgment is defective or deficient or does not meet the Specifications, or that Subcontractor damages or destroys in carrying out its obligations under this Agreement, without any additional compensation. All Work will be performed to the satisfaction of Contractor and Owner, whose determination will be final and binding on Subcontractor, subject to Subcontractor's right to dispute the same. Subcontractor will cooperate and coordinate with all other contractors, subcontractors, and suppliers so as not to delay or hinder the performance of their work under the Primary Contract.

3.  Schedule of Work. Subcontractor will commence the Work upon receipt of Contractor's notice to proceed and will prosecute the Work, or any part thereof, with such diligence as to comply with the Project Schedule, as adjusted from time to time. Contractor may at any time require Subcontractor to alter the schedule with respect to the order of completion of particular segments of the Work, or to stop work altogether or to suspend or to terminate performance of this Agreement, or to recommence work and Subcontractor's time for performance of work. Timely completion of the Work in accordance with the schedule for completion is of importance in connection with this Agreement, and failure to comply with the schedule for reasons due to Subcontractor's fault or failure will be grounds for (a) reduction of any compensation payable to Subcontractor under this Agreement, or (b) any other remedies provided for under paragraph 18 of this Agreement. The hours of Work and the days upon which Subcontractor will perform the Work will be solely within the discretion of Subcontractor, consistent with the schedule of Work, this Agreement and the Primary Contract. Subcontractor shall accelerate work, work overtime and take whatever actions become necessary

DBC
SUBCONTRACTOR INITIALS

to ensure that the Work is performed within the Schedule for completion. Where delays are a need for acceleration are due to the fault or failure of Subcontractor, such acceleration, overtime or other action shall be without additional cost to Contractor. Subcontractor will provide Contractor with such reports and other evidence of the progress of the Work as Contractor will reasonably request. Contractor may inspect the Work at all reasonable times without notice to Subcontractor.

4.  Change Orders.  Contractor may direct Subcontractor, in writing, to make changes to the Work, and Subcontractor's compensation and/or the Project Schedule shall be equitably adjusted in accordance with the terms of this Agreement and Schedule 1 hereto. Subcontractor's compensation and/or the Project Schedule may also need to be adjusted in the event of changes to the Scope of Work or delays in beyond the reasonable control of Subcontractor. Changes shall include, and Subcontractor's compensation and/or the Project Schedule shall be equitably adjusted in accordance with the terms of this Agreement and Schedule 1 hereto. Adjustments, if any, in the contract price or the schedule of Work resulting from such changes will be set forth in a written Subcontract Change Order, in compliance with the Primary Contract. All Change Orders must be approved in writing by an authorized officer of Contractor in order for Subcontractor to receive compensation for the work performed and said change orders must provide specific standards for compensation due to Subcontractor under the change order, such as applicable unit prices. Except to the extent that a change or delay is necessitated by the order, act or omission of Contractor or its third party subcontractors, no additional compensation shall be due Subcontractor unless such compensation is obtainable under the Primary Contract. Subcontractor may not suspend the performance of this Agreement pending review and approval of any Change Order or for any other reason. Except as otherwise set forth on Schedule 1 and those exclusions set forth in Subcontractors disclaimer, Subcontractor shall receive no additional compensation due to unknown and/or concealed physical conditions. Subcontractor shall receive no additional compensation due to deficiencies in the project Specifications, unless such conditions could not have been discovered by a diligent review of the same by Subcontractor prior to the execution of the Agreement.

5.  Contractor's Intellectual Property. All Specifications and all other materials, documentation or information regarding the Work, the Primary Contract, the Owner or the Contractor supplied to or obtained by Subcontractor from Contractor or its representatives, or that Subcontractor prepares or creates or causes to prepare or create specifically related to the Work (collectively, the "Information"), are the sole property of Contractor, and Subcontractor may use the Information solely for purposes of completing the Work in accordance with the terms of this Agreement. Subcontractor will execute and deliver any documentation necessary or desirable to vest indefeasibly title to such Information in Contractor. The Information will be considered confidential,

DB

SUBCONTRACTOR INITIALS

and Subcontractor may not release or disclose the Information to any person or entity without Contractor's prior written consent. Information does not include documentation or information which: (a) is or becomes publicly available; or (b) was known by Subcontractor prior to its receipt from Contractor or Owner; or (c) was lawfully obtained by Subcontractor from a third party; or (d) was or is developed by Subcontractor independently. If Subcontractor is legally requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or, in the opinion of counsel for Subcontractor) to disclose any of the Information, Subcontractor shall promptly notify Contractor of such request or requirement prior to disclosure so that Contractor may seek the appropriate protective order or waive compliance with the term of this Agreement requiring Contractor's written consent. Subcontractor may not use, and acquires no interest of any kind in, Contractor's or Owner's name, trademarks, or other intellectual property of any kind, except as specifically permitted in writing. Subcontractor acknowledges that a breach or threatened breach of this provision would result in irreparable injury to Contractor for which money damages would not be sufficient and agrees that Contractor shall be entitled to seek immediate injunctive or other equitable relief to remedy or forestall a breach or threatened breach. Such remedy shall not be exclusive, but shall be in addition to all others available at law or in equity.

6.  Permits, Licenses or other Authorizations.     Except as otherwise set forth in Schedule 1, Subcontractor will be responsible for any permits, licenses or other authorizations necessary for Subcontractor to perform t h e Work, copies of which will be provided to Contractor no later than five (5) days after execution of this Agreement. To the extent required of Contractor under the Primary Contract for the Scope of Work under this Agreement, Contractor will be responsible for obtaining other permits, licenses and authorizations for the project specified in the Primary Contract. Subcontractor will comply with the requirements of all such permits, licenses and authorizations. In addition to the requirements of paragraph 16 below, Subcontractor will indemnify, defend and hold Contractor and Owner harmless from any and all fines, penalties, and forfeitures, whether civil or criminal, to the extent arising from Subcontractor's non-compliance with this paragraph.

7.  Subcontractor's Performance Costs/Protection of Assets. Subcontractor at its expense will supply all labor, tools, equipment, vehicles, fuel and other materials and will provide all transportation, storage and other facilities necessary to perform the Work properly, other than as specified herein or in the Primary Contract or the Specifications. Any materials supplied by Subcontractor must meet the standards established by Contractor or Owner under the Primary Contract. Subcontractor will be responsible for the condition and safekeeping of any tools, equipment, vehicles, materials or other tangible assets (collectively, the "Assets") provided by Subcontractor or provided to Subcontractor by Contractor, Owner or another subcontractor in connection

𝌆𝌆ᑐᗷᑕ
SUBCONTRACTOR INITIALS

with the Work, and will return such Assets to their rightful owner (to the extent not used in completing the Work) upon completion of the Work. Subcontractor will maintain the Assets used in connection with the Work in good operating condition, repair, and appearance, and protect the same from deterioration, other than normal wear and tear, and will use the Assets in the regular course of business only within its normal capacity, without abuse, and in a manner contemplated and recommended by the manufacturer. Any Assets that are loaned or rented to Subcontractor, will be the sole responsibility of Subcontractor, who will be responsible for adequately insuring said Assets in accordance with the requirements of this Agreement.

7.1 Use of Contractor's Equipment. Contractor may, at Contractor's sole discretion, permit Subcontractor to use its tools or equipment for performance of the Work. Contractor makes no representations or warranties as to the condition or suitability of the tools or equipment, which Subcontractor agrees to use at its own risk. Contractor will have no liability for any injuries, damages, cost, or claims arising from Subcontractor's use of such tools or equipment. Subcontractor will indemnify and defend Contractor from any and all Liabilities which arise out of Subcontractor's use of Contractor's tools or equipment including all claims by Subcontractor's employees or any third parties brought against Contractor.

8.  Subcontractor's Compliance with Laws. Subcontractor and its employees and agents will observe all safety, nondiscrimination, equal employment, drug and alcohol, business ethics and other rules and policies of Contractor and Owner and all applicable laws, rules and regulations of any governmental authority in performing the Work, including without limitation those requiring the maintenance of Internal Revenue Service (IRS) I-9 employment tax records and those relating to safety and health, the environment, and labor and employment, Social Security and Medicare (FICA), Federal Income Tax Liability, Federal Unemployment Taxes (FUTA), state and local income taxes, State Unemployment Insurance (SUI), wage and tax reports, state disability, Employee Retirement Income Security Act (ERISA) and Workers Compensation (collectively, "Requirements"). Subcontractor shall conform to Contractor's safety program, labor policies, practices and procedures, and shall adopt and enforce a safety program acceptable to Contractor. Subcontractor will conduct drug or alcohol testing and will conduct background checks on Subcontractor's employees. Subcontractor acknowledges and agrees to fully comply with the provisions of Federal Labor Provisions (PR 1273), Notice of Affirmative Action (Executive Order 11246) (43 FR 14895) and Standard Federal EEO Specifications (Executive Order 11246) (43 FR 14895), to the extent applicable. Contractor or Owner will have the right to audit Subcontractor's compliance with the Requirements and the other requirements of this Agreement and the Primary Contract at any time, and Subcontractor will provide any documentation requested by Contractor or Owner and will otherwise cooperate in the conduct of such audits. Contractor may direct

$\mathcal{B}_{\mathcal{L}}$
SUBCONTRACTOR INITIALS

Subcontractor to stop all Work until Contractor has determined that Subcontractor is in compliance with the Requirements.

9. Independent Contractor Status. Subcontractor is engaged as an independent contractor and is not an agent or employee of Contractor. Subcontractor acknowledges that Contractor may engage other subcontractors or agents to carry out a portion of the Work or other work related thereto. Subcontractor further acknowledges that it may not contract with the Owner to provide the same or similar services on the Project as are provided in this Agreement during the term of this Agreement, including any applicable warranty periods. Subcontractor may not delegate or further subcontract any of the Work without the prior written consent of Contractor. All subcontractors of Subcontractor shall comply with the insurance requirements set forth herein. In the event Contractor provides the consent required by this section, Subcontractor shall obtain from such subcontractors and provide to Contractor copies of certificates of insurance and endorsements evidencing such compliance. Subcontractor has full control and supervision of the performance of the Work. Contractor or Owner may deny access to the Work site to any employee or other agent of Subcontractor who is not in compliance with the requirements of this Agreement, the Primary Contract, or the Requirements. Subcontractor is responsible for scheduling Subcontractor's personnel, subject to the Contractor's schedule of completion and other requirements. Subcontractor is solely responsible for payment of all compensation and benefits to its employees and others engaged by it to perform the Work and for all workers' compensation, unemployment compensation, health, life and disability insurance, social security and income tax withholding, and all other federal, state and local withholding taxes or other taxes, withholdings and payments due on account of such compensation. Contractor or Owner may require Subcontractor to submit payroll records to Contractor.

10. Inspection of Work site, Primary Contract and Specifications. Subcontractor acknowledges that it has (a) visited the site(s) where the Work is to be performed and visually inspected and is familiar with the reasonably ascertainable general and local conditions which could affect the Work, and (b) reviewed the terms and conditions of the Primary Contract, including the Specifications. Subject to the terms set forth in Schedule 1 and those exclusions set forth in Subcontractors disclaimer, Subcontractor assumes the risk of all manmade and natural conditions of the site(s) where the Work is to be performed to the extent that the same are reasonably foreseeable or ascertainable. Neither Contractor nor Owner guarantees the accuracy of the Specifications, any information concerning the work site(s) or other conditions applicable to the Work.

11. Subcontractor's Waste/Debris Removal Obligations. Subcontractor will remove at its expense any trash, debris and surplus materials left over or resulting from the performance of the Work. Subcontractor is responsible for any


SUBCONTRACTOR INITIALS

damage to property to the extent caused directly or indirectly by Subcontractor or its agents or representatives, including approved subcontractors.

12. <u>Payment Terms</u>. Upon completion of each crossing contemplated by Subcontractor's Proposal and acceptance of such portion of the Work by Contractor and Owner and contingent upon Subcontractor's delivery to Contractor of complete releases of lien and evidence that Subcontractor has paid its subcontractors and/or materialmen as more fully set forth herein, Contractor will pay Subcontractor for the Work in conformity with prices contained in Schedule 1, which prices shall be linked directly to a standard (e.g. schedule of values or unit prices). Payments shall be made to Subcontractor within ten (10) days after Contractor's receipt of payment for the Work from Owner, but in no event later than forty-five (45) days after Contractor's receipt of an undisputed invoice from Subcontractor, regardless of any delay or failure to pay by Owner. Subcontractor will cooperate fully with Contractor in supplying any documentation r e q u i r e d by Owner to release payments to Contractor, including receipts and releases of lien. So long as Contractor is in compliance with its payment obligations hereunder,
Subcontractor shall execute such waivers of lien, affidavits and statements as may reasonably be required by Contractor and shall furnish Contractor with such waivers of lien, affidavits and statements from Subcontractor's material suppliers and subcontractors. Contractor may retain from any payments due to Subcontractor the same percentage that is retained by Owner from payments to Contractor under the Primary Contract but no more than ten (10) percent. In connection with any payment, Subcontractor will provide a complete and current list of all Subcontractor's subcontracts and purchase orders, the price of each subcontract and purchase order, the date of the most recent invoice on each, the date of the most recent payment on each, the current amount due and owing on each subcontract and purchase order and a general release and waiver of all liens from all subcontractors and suppliers. Any payment will constitute full and complete payment for all Work performed by Subcontractor and identified in Subcontractor's invoice, but will not constitute acceptance of any defective work or materials. Contractor will not be obligated to pay for any work or materials not included in the description of the Work or any properly authorized Change Order.

12.1 Contractor, if in its reasonable determination, may offset against amounts due to Subcontractor under this Agreement or withhold from Subcontractor any amounts determined by Contractor to be due from Subcontractor under this Agreement, the Primary Contract or otherwise for, including but not limited to, (a) defective work not remedied, (b) claims filed or reasonable evidence indicating the likely filing of mechanics' liens against the premises or buildings, or against the funds for construction of the improvement and arising out of the Work, (c) failure of Subcontractor to make payments properly to materialmen and laborers, and (d) a reasonable doubt that the Agreement can be completed for the balance then unpaid.

DB

SUBCONTRACTOR INITIALS

Contractor may make joint check payments to the Subcontractor and the Subcontractor's suppliers and/or subcontractors. Contractor's periodic payment to Subcontractor neither constitutes nor implies approval or acceptance of the Work.

13.    <u>Subcontractor's Covenant to Pay its Debts</u>. Subcontractor warrants that it has sufficient funds and credit to pay currently all bills incurred in the performance of the Work without the necessity of resorting to earnings for work performed hereunder, and agrees that failure to pay such bills will be a breach of this Agreement for which Contractor may terminate this Agreement in accordance with paragraph 18, or may, but is not required to, withhold all sums otherwise payable under this Agreement for past and future earnings until Subcontractor presents satisfactory evidence of payment, and in case any such bill or claim is disputed by Subcontractor, Contractor may, for the purposes of this Agreement consider the same to be valid until discharged and released or until satisfactory security is given for Contractor's indemnification. At Contractor's option, Contractor may, but will not be required to, pay any such bill or claim and recover the same from Subcontractor or any surety or deduct the same from any payments (progress or retainage) otherwise due hereunder. Any and all payments made in good faith in the belief that Subcontractor is liable, whether liable or not, will be conclusive of Contractor's right to reimbursement, and a sworn itemized statement thereof or the checks or other evidence of payment will be conclusive evidence of the fact and extent of Subcontractor's liability to Contractor.

14.    <u>Waiver of Right to File Liens</u>. At Contractor's request, Subcontractor will provide (a) a release in a form acceptable to Contractor of any mechanic's or materialman's or other liens or encumbrances in connection with the Work, and (b) an affidavit disclosing the identity and address of all persons or entities that have supplied materials or labor in connection with the Work and releases in a form acceptable to Contractor from any of such persons or entities. Contractor will have the right to make payments directly to such persons and entities. In addition to the requirements of paragraph 12, final payment to Subcontractor is contingent upon Subcontractor delivering the releases and affidavits contemplated by this paragraph.

15.    <u>Insurance Requirements</u>. Subcontractor will provide and maintain at its own expense at least the minimum insurance coverages set forth on Schedule 2, including all coverages required under worker's compensation laws of the State where work is to be performed, and, with such insurance companies and in such form as will be satisfactory to Contractor and Owner. Such coverages shall be placed with insurers acceptable to Contractor and must have a minimum Best Rating of A or better. Any combination of primary and excess liability insurance coverage shall be an acceptable method of providing the insurance coverage required in Schedule 2 or by the Owner, whichever is greater. If required by the Primary Contract, Subcontractor will provide such

ᎠᏴᏓ
<u>SUBCONTRACTOR INITIALS</u>

additional insurance coverages as is required by Owner under the Primary Contract. All insurance required under this Agreement, except Professional Liability if required, must be on an "occurrence" basis and not on a "claims made" basis. Subcontractor, prior to commencement of any Work, will provide Contractor with ACORD certificates of insurance and insurance policy endorsements evidencing the coverages required by this Agreement in a form acceptable to Contractor, which certificates and endorsements will also provide that (a) to the extent of the liabilities assumed by Subcontractor hereunder, Contractor and Owner is named as an additional insured under all insurance policies required by this Agreement (except Workers Compensation and Professional Liability), and (b) the insurance carrier must provide thirty (30) days prior written notice to Contractor of any cancellation of or material modification of such insurance policies. To the extent of the liabilities assumed by Subcontractor hereunder, Subcontractor expressly waives any rights to recovery by subrogation or otherwise for itself and its insurance carrier against Owner, including its parent and affiliated companies and their directors, officers, employees and agents as well as Contractor and its other subcontractors. To the extent of the liabilities assumed by Subcontractor hereunder, Subcontractor shall include Contractor, Owner and, their subsidiaries, affiliates and employees as additional insureds on Subcontractor's commercial general liability insurance policy, using endorsement forms CG 2010 and CG 203 and Automobile Liability policy. Copies of endorsement forms shall be attached to the Subcontractor's certificate of insurance. The maintenance or failure of maintenance, of the insurance required by this Agreement will not relieve Subcontractor of any liability to Contractor under this Agreement or otherwise. The provisions of this section are not intended to create a contract for the benefit of any person other than Owner and Contractor. The required insurance certificates and endorsements must be furnished to Contractor no later than five (5) days after execution of this Agreement and prior to the commencement of any operations, at the address set forth on the first page of Schedule 1 and to:

Legal Department
MasTec North America, Inc
800 Douglas Road, 12th Floor
Coral Gables, FL 33134
Facsimile: 305-406-1907

In addition to the foregoing insurance, Contractor may require Subcontractor to obtain at Subcontractor's expense a performance or payment bond in such amount and form and with such bonding companies as Contractor may determine. The premium for any such bond shall be paid by Contractor. Any such bonding requirement will be specified in Schedule 2. In the alternative, if so specified in Schedule 2, Contractor may require Subcontractor to pay a pro-rata portion of the premium on any bond required of Contractor by Owner under the Primary Contract.

$\overline{\text{SUBCONTRACTOR INITIALS}}$

Subcontractor acknowledges that, as a reasonable accommodation to Subcontractor, Contractor may only be requiring Subcontractor to maintain insurance coverage with limits that are lesser than that required under Contractor's agreement with Owner. In consideration of this reasonable accommodation, Subcontractor hereby expressly and specifically agrees to indemnify, defend and hold harmless Contractor, to the extent of its indemnity obligations set forth in paragraph 16 below, from and against any and all claims made against and losses sustained by Contractor as a result of Subcontractor's failure to maintain insurance with coverage limits that are equal to or greater than those maintained by Contractor under its agreement with Owner.

15.1 Subcontractor shall have a continuing obligation to keep the lists of any personnel used to perform any of the Work that are employed by leasing companies current and shall ensure that leasing companies employing such personnel maintain the workers compensation and other insurance coverages required by this Agreement. Subcontractor's failure to comply with this part shall constitute a material breach of this Agreement. Subcontractor shall indemnify and hold Contractor harmless from any losses to the extent arising from its failure to comply with this requirement.

16.    Indemnification.

a.    To the fullest extent permitted by law, Subcontractor agrees to indemnify and hold harmless Contractor and its directors, officers, employees and agents (collectively the "Indemnitees") and each of them from and against any loss, costs, damages, claims, expenses (including attorneys' fees) or liabilities, causes of action, lawsuits, penalties, or demands (collectively referred to as "Liabilities") by reason of any injury to or death of any person or damage to or destruction or loss of any property to the extent arising out of, resulting from, or in connection with (i) the performance or nonperformance of the Work contemplated by this Agreement but only to the extent that such Liabilities are or are alleged to be directly or indirectly caused, in whole or in part, by any negligent act, omission, default, negligence (whether active or passive) of Subcontractor or its employees, agents or subcontractors, and except to the extent that such Liabilities are or are alleged to be, caused in whole or part (whether joint, concurrent, or contributing) by any act, omission, default or negligence (whether active or passive) of the Indemnitees, or any them or (ii) the failure of Subcontractor or its employees, agents, or subcontractors to comply with any of the Articles herein or the failure of Subcontractor or its employees, agents, or subcontractors to conform to statutes, ordinances, or other regulations or requirements of any governmental authority in connection with the performance of the Work provided for in this

ßℒ
SUBCONTRACTOR INITIALS

Agreement. Said indemnity shall include but not be limited to injury or damage which is or is alleged to be caused in whole or in part by any act, omission, default or negligence of Subcontractor or its employees, agents, or subcontractors. Contractor and Subcontractor agree that the indemnification given herein shall be limited to the amount of loss suffered by the Indemnitees or Insurance Coverage per occurrence, whichever is less, which amount is stipulated by the parties to bear a reasonable commercial relationship to the value of the Agreement. Subcontractor expressly agrees to defend, indemnify and hold harmless the Indemnitees, or any of them, from and against all Liabilities which may be asserted by an employee or former employee of Subcontractor, or any of its subcontractors, as provided above, for which the Subcontractor's Liability to such employee or former employee would otherwise be limited to payments under state Worker's Compensation laws or an Employee Liability policy, premises liability principles or any other law or form of legal duty or obligation.

b.  Subcontractor further agrees to indemnify and hold harmless the Indemnitees from and against (i) any and all penalties to the extent imposed on account of the violation of any law, ordinance, order, rule, regulation, condition, or requirement, in any way related, directly or indirectly, to Subcontractor's or its employees', agents', or subcontractors' performance hereunder, compliance with which is left by this Agreement to the Subcontractor and (ii) any and all claims, liens and/or suits for labor and the materials furnished by the Subcontractor on its employees, agents or subcontractors or utilized in the performance of this Agreement or otherwise. This includes, but is not limited to, employment discrimination charges and actions arising under Title VII of The Civil Rights Act of 1964, as amended; The Equal Pay Act; The Age Discrimination Act, as amended; The Rehabilitation Act; The Americans with Disabilities Act; The Fair Labor Standards Act; The National Labor Relations Act; and any other applicable law.

c.  Subcontractor's indemnification obligations hereunder shall not extend to Liabilities arising by reason of any injury, death, or damage to any person or property whatsoever, caused by, arising from, incident to, or connected with the performance or nonperformance of the work contemplated by this Agreement to the extent that such Liabilities are or are alleged to be, caused in part (whether joint, concurrent, or contributing) or in whole by any negligent act, omission, default, or negligence (whether active or passive) of the Indemnitees. The foregoing indemnity shall also include liability imposed by any doctrine of strict liability.

d.  Where Contractor is the prevailing party, Subcontractor further agrees to reimburse Contractor for and/ or hold harmless against any and all attorneys' fees and other expenses and costs incurred in pursuing any

claim, suit, or lien brought by Contractor against Subcontractor or those acting under its direction to the extent arising out of or resulting from a breach by Subcontractor or those acting under its direction of any provision of this Agreement or performance or nonperformance hereunder.

e. Subcontractor shall, at its own sole cost, expense, and risk, defend any claim, suit, action or other legal proceeding (collectively "action") arising out of the performance or nonperformance of this Agreement brought jointly against the Indemnities or any of them and the Subcontractor or against any of the Indemnitees and, shall, to the extent of its indemnification obligations hereunder, pay and satisfy any judgment or decree which may be rendered against any of the Indemnitees in any such action. and shall pay any costs and attorney's fees which may be incurred by the Indemnitees in connection therewith and/ or in enforcing the indemnification provisions set forth above. Should the Subcontractor, in judgment of Contractor, ignore or fail to properly handle or defend any such action, Contractor may at its option assume and undertake, or join the handling or defense of any such action, and in that event the Subcontractor will reimburse Contractor for attorney's fees and other expenses incurred by Contractor in handling and defending same, including to the extent of Subcontractor's indemnification obligations hereunder reimbursement of any amount reasonably paid by contractor in settlement thereof or in satisfaction of any judgement rendered.

f. The foregoing indemnity shall be in addition to any other indemnity obligations of Subcontractor set forth in this Agreement.

g. Notwithstanding the foregoing or any other provision of this Agreement or the Contract Documents to the contrary, under no circumstances will Subcontractor Group be responsible for liabilities, damages or claims arising out of any pollution, hazardous substance or other environmental condition pre-existing under, on or near the site(s), including areas of ingress or egress, where operations will be performed by Subcontractor in connection with the Work. .

17. Termination, Suspension or Delay of Work. If the Primary Contract to which this Agreement refers is terminated, suspended or delayed for any reason, this Agreement will be terminated, suspended or delayed on the same basis and upon the same effective date as the termination, suspension or delay of the Primary Contract. Upon such a termination, suspension or delay of this Agreement, Subcontractor will be entitled to recover from Contractor such amounts as are payable to Subcontractor for the portion of the Work completed by Subcontractor prior to such termination, suspension or delay. Except where the termination, suspension or delay is due to the fault or negligence of Subcontractor, Subcontractor may also be entitled to mobilization, start-up, demobilization, stand-by rates or other amounts as set forth in Schedule 1. In no event shall Subcontractor be entitled to consequential, special, incidental,

liquidated or punitive damages, or for commercial loss or lost profits, unless such amounts or damages are awarded to Contractor, in which case Subcontractor may recover such amounts or damages for the portion of the Work completed by Subcontractor in accordance with the payment rates set forth herein. Subcontractor will not be entitled to any other remedy for a termination, suspension or delay under this Section 17 including any amounts directly from Contractor.

18.    <u>Contractor's Remedies.</u>  In addition to all other legal rights or remedies which Contractor may have available to it in law or equity, Contractor may terminate this Agreement immediately at any time if Subcontractor becomes insolvent, is unable to pay its debts as they come due, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy or for reorganization or has filed against it an involuntary petition, or takes any other similar action. Contractor may also terminate this Agreement in the event of (a) the failure of Subcontractor to perform the Work safely, diligently, promptly and efficiently or in accordance with the schedule of Work, or (b) a breach by Subcontractor of the provisions of this Agreement or the Primary Contract, which such breach or failure continues without cure for a period of five (5) days after written notice thereof from Contractor to Subcontractor. Contractor may also terminate this Agreement at any time upon giving ten (10) days written notice to Subcontractor. Upon termination of this Agreement for any reason, Subcontractor will immediately cease all work and vacate the job site, and will return all Assets supplied by Contractor, Owner or other subcontractors. Contractor may offset against any amounts due to Subcontractor by Contractor under this Agreement the amount of any losses, claims or other damages recoverable by Contractor from Subcontractor under this Agreement. Upon termination for Subcontractor's breach or default, Contractor may terminate the agreement and hire other subcontractors to complete any work left unfinished by Subcontractor or to repair any of Subcontractor's defective work. In such circumstance, Subcontractor shall not be entitled to receive payment under this Agreement which may be due, until said work shall be finished and payment in full therefore shall be made by Owner to Contractor, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the expense incurred by Contractor in finishing or repairing Subcontractor's work, such excess shall be paid to Subcontractor.

19.    <u>Defective/Incomplete Work.</u>    The Subcontractor shall, within twenty- four (24) hours after receiving written notice from the Contractor so to do, proceed to remedy all incomplete Work and/or to remove from the site all materials found to be defective by the Contractor or Owner, whether assembled or not, and to dismantle all portions of the Work which shall be condemned as unsound or in any way fails to conform to the requirements of the Agreement or the Primary Contract, and to replace, at its own expense, all work damaged or destroyed thereby, and, replace with sound materials all materials which are removed from the said site. The Subcontractor guarantees that its Work shall be free from any defects due to faulty materials or workmanship, or

<u>ЊВ~</u>
SUBCONTRACTOR INITIALS

any violation of the Agreement requirements, for the same period of time as the Contractor is liable to the Owner for the same. The Subcontractor, in addition to removing and replacing, at its own expense, its defective work, shall pay for all damage to the extent caused by such defects, and all expenses necessary to replace or repair satisfactorily any other work damaged or disturbed in making repairs to or replacement of its own Work. If Subcontractor fails to remedy all defective or incomplete work after notice by Contractor, Contractor may remedy such condition and back charge Subcontractor for such costs and expenses plus 10%.

20. <u>Survival of Provisions</u>. Without limiting the survivability of o t h e r provisions of this Agreement, Subcontractor's obligations set forth in paragraphs 1, 3, 5, 7, 9, 12, 12.1, 13, 14-19 and Schedule 1 will survive expiration or termination of this Agreement for any reason.

21. <u>Notices</u>. Any notice required by this Agreement will be effective and deemed delivered (a) three (3) business days after posting with the United States Postal Service when mailed by certified mail, return receipt requested, properly addressed and with the correct postage, (b) one (1) business day after pickup by the courier service when sent by overnight courier, properly addressed and prepaid or (c) one (1) business day after the date of the sender's electronic confirmation of receipt when sent by facsimile transmission. Notices must be sent to the addresses or facsimile numbers set forth on Schedule 1, unless either party notifies the other in writing of an address or facsimile number change, which change will take effect three (3) business days after receipt (as defined in the preceding sentence) of the change by the receiving party.

22. <u>Choice of Law/Venue</u>. This agreement is governed by the laws of the State of Florida, without regard to its conflict of laws rules. Contractor and Subcontractor each hereby irrevocably agree and submit to the exclusive jurisdiction of the Circuit Court, Eleventh Judicial Circuit, Miami-Dade County, Florida in the event any action or proceeding is commenced by either party arising from, related to or in connection with this Agreement.

23. <u>Beneficial Parties/Assignment/Merger/Modification</u>. This Agreement: (a) inures to the benefit of and is binding upon the parties and their respective successors and permitted assigns; (b) may not be assigned except that Contractor may assign and delegate its rights and obligations under this Agreement to any affiliate of Contractor and Subcontractor may assign its right to accounts receivable under the limited circumstances set forth in paragraph 35 below; (c) contains the entire agreement of the parties and supersedes any earlier or contemporaneous understanding or agreement; (d) may not be amended except by a writing signed by each of the parties; (e) may not be modified or waived unless in writing, and signed by a duly authorized representative of each party;

DBc
_____
SUBCONTRACTOR INITIALS

24. <u>Delays.</u> Should either Party be unable, in whole or in part, to perform its obligations under this Agreement by reason of force majeure, such Party shall be excused from performance (other than the obligation to make payments for work properly performed prior to the force majeure event) to the extent it is affected by such force majeure. The Party affected by force majeure shall endeavor to remedy the impediment to its performance with all reasonable dispatch. The term "force majeure" shall mean any cause which is not due to the fault or failure of, and not within the reasonable control of, the Party claiming force majeure.

25. <u>Severability.</u> Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of the prohibition or unenforceability without invalidating the remaining provisions of this Agreement and any prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable the provision in any other jurisdiction. To the maximum extent permitted by applicable law, the parties to this Agreement waive any provision of law that renders any provision of this Agreement prohibited or unenforceable in any respect.

26. <u>Non-waiver.</u> No failure or delay of a party in exercising any power or right under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

27. <u>Joint Venture/Partnership.</u> Nothing in this Agreement will be deemed to create a joint venture or partnership between the parties.

28. <u>Time is of Material Importance.</u> As to Subcontractor's performance hereunder, time is of material importance.

29. <u>Construction of Contract.</u> This Agreement was negotiated pursuant to an arm's length transaction and is the product of joint drafting. Each party acknowledges that it has had sufficient opportunity to consult with attorneys regarding the terms of this Agreement before signing it. This Agreement shall not be construed against any party more strictly than against the other party.

30. <u>Counterparts.</u> This Agreement may be executed on any number of counterparts with the same effect as if the signatures were on the same instrument.

31. <u>Headings.</u> The headings of each paragraph in this Agreement are merely for informational purposes and not to be construed as forming part of the Agreement.

32. <u>LIMITATION OF LIABILITY.</u> NOTWITHSTANDING ANY TERM OR CONDITION TO THE CONTRARY CONTAINED HEREIN, NEITHER PARTY


SUBCONTRACTOR INITIALS

SHALL BE LIABLE FOR, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR EXMPLARY OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO, LOST PROFITS, OR DAMAGES RESULTING FROM BUSINESS INTERRUPTION WHETHER BASED IN WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

33.   <u>Assignment of Accounts Receivable</u>.    Subcontractor may not assign its accounts receivable due from Contractor hereunder or any other monies otherwise due from Contractor to any third-party, factoring company or otherwise, without first obtaining Contractor's written consent to such assignment. Such written consent shall only be valid if it is provided by the president of Contractor and shall only be provided by Contractor if legitimate business reasons justify providing the same. Under any circumstances arising from the assignments contemplated in this paragraph, including those in which Contractor consents to such an assignment, Subcontractor will indemnify, defend and hold harmless Contractor and Owner and their respective officers, directors, stockholders, affiliates, employees, agents, subcontractors, independent contractors and other representatives (collectively, the "Assignment Indemnitees") from and against all claims, damages, liabilities, losses, penalties, injuries, and expenses (including attorneys' and paralegal fees and court costs and including penalties and interest) incurred or suffered, directly or indirectly (including consequential, punitive and other special damages) (collectively, "Damages"), by the Assignment Indemnitees and arising out of or resulting from, directly or indirectly, the assignment contemplated in this paragraph. The text of this paragraph 35 is in addition to and does not limit any similar language contained elsewhere in this Agreement.

34.   <u>Additional Terms</u>. Additional terms and conditions applicable to this Agreement, if any, are set forth on Schedule 1.

[SIGNATURES ON NEXT PAGE]

_BC_
SUBCONTRACTOR INITIALS

EXECUTED: <u>March 30, 2017</u>

CONTRACTOR:                                    SUBCONTRACTOR:

By:                                            By:

_____               _____
Name: Robert Poteete                           Name: Daniel B Carasco
Title: Senior Vice President                   Title: President

MBc
SUBCONTRACTOR INITIALS

## SCHEDULE 1

**Name of Contractor:**

    Precision Pipeline, LLC

**Address of Contractor:**

    3314 56th Street
    Eau Claire, WI 54703-6322

    **With a copy to:**

    MasTec North America, Inc. Legal
    Department
    800 Douglas Road
    Coral Gables, Florida 33134 Fax:
    305.406.1907

**Telephone/Fax No.:**
(715) 874-4510

**Name of Subcontractor:**
Carson Corporation

**Address of Subcontractor:**
171 Route 94
Lafayette, NJ 07848

**Telephone/Fax No.:**
Office: 973-579-4100
Fax: 973-579-4105

**Primary Contract/Owner:**
Energy Transfer

**Primary Contract Location:**
Ohio, Michigan, and West Virginia

**Effective Date:**
March 30, 2017

JBL
SUBCONTRACTOR INITIALS

**Scope of Work:**
Per the attached proposal, to provide HDD services on the Rover Project for Energy Transfer.

**Pricing: See attached pricing sheets.**

**Subcontractor's Reporting Requirements:**
1. **The Subcontractor shall prepare, on a form provided by the Company, a monthly itemization of the employee man hours worked for the period. Each report shall include both the prior period as well as cumulative man hours, and should be provided to the Company no later than the 5th day of the following month.**

2. **Subcontractor shall submit copies of Subcontractor's daily timesheets and daily progress reports to Contractor's field office manager no later than the day following the completion of the work.**

**(If necessary, attach additional sheets to complete any of the above items.)**



**CARSON**
**CORPORATION**
DIRECTIONAL DRILLING
· CIVIL CONSTRUCTION

P 973.579.4100
F 973.579.4105

carsoncorporation.net

171 Route 94
Lafayette, NJ 07848

March 24, 2017

Carter Larson
Pretec Directional Drilling
3314 56th Street
Eau Claire, WI 54703

Phone: (715) 271-9724
Email: clarson@pretecdd.com

Re: Rover Pipeline
Ashland, Tuscarawas and Seneca, OH
Horizontal Directional Drill Quote

Dear Carter:

Carson Corporation is pleased to submit this quotation for Horizontal Directional Drilling (HDD) the dual 42" steel gas pipe lines for the above referenced project.

| | HDD Crossing | Pipe Size | Length (l.f.) | Unit Price | Extension |
|---|---|---|---|---|---|
| 1 | Sandy Creek A | 42" | 1,619 | $1,350 / l.f. | $ 2,185,650.00 |
| | Sandy Creek B | 42" | 1,619 | $1,350 / l.f. | $ 2,185,650.00 |
| 2 | Wolf Creek A | 42" | 1,752 | $1,350 / l.f. | $ 2,365,200.00 |
| | Wolf Creek B | 42" | 1,752 | $1,350 / l.f. | $ 2,365,200.00 |
| 3 | Interstate 71 A | 42" | 1,403 | $1,350 / l.f. | $ 1,894,050.00 |
| | Interstate 71 B | 42" | 1,403 | $1,350 / l.f. | $ 1,894,050.00 |

*Notes:*

1. This proposal is based on working 12 hours per day / 6 days per week utilizing union wages.
2. This proposal assumes a water can be obtained from a nearby source.
3. This proposal is based the use of a mud motor and rock reamers.
4. This proposal assume the site is accessible and can support the drill rig and support equipment.
5. The proposal assumes all drilling fluids and cuttings shall remain on-site for disposal by others. Carson Corporation will transport the drilling fluids and cuttings up to 10 miles to another location and no additional cost.
6. For budgeting purposes, Carson Corporation can truck and dispose of the drill cuttings and mud for approximately $250/l.f.

*Carson Corporation*
*Rover Pipeline*
*Ashland, Tuscarawas and Seneca, OH*

*Inclusions:*

1. Submittals and pre-drill plan.
2. Surveying and construction stake out.
3. All drilling supplies, cutting fluids and pipe rollers (if needed).
4. Frac Out Plan and vacuum truck(s) for drilling fluid containment.
5. Pollution Liability Insurance.
6. As built plan and profile drawings.

*Exclusions:*

1. Furnishing, staging, welding and coating the gas pipe.
2. Testing and pigging the gas pipe.
3. Clearing.
4. Connections to any existing piping.
5. Permits/Approvals.
6. Inspection fees.
7. Soil erosion and sediment control beyond drill rig set up area.
8. Traffic control including traffic officers.
9. Noise control.
10. Movement and/or removal of contaminated or hazardous material.
11. Removal, replacement or repair of uncharted, unmarked or incorrectly shown existing utilities.
12. Performance or Payment Bond. Please 1.5% if required.

Pricing for any of the above exclusions can be provided if requested.

Thank you for the opportunity to provide this quotation. Please contact me if you have any questions.

Respectfully yours,
**Carson Corporation**

Scott T. Murray, PE
Vice President

<u>**SCHEDULE 2**</u>
**(Insurance; Performance Bonds)**

**Insurance:**

*Commercial General Liability*

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Products – Completed Operations Aggregate | $1,000,000 |
| Personal and Advertising Injury Liability | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Damage to Rented Premises | $50,000 |
| Medical Expense (any one person) | $5,000 |

*Automobile – Combined Single Limit*     $1,000,000

*Worker's Compensation and Employers Liability*

| | |
|---|---|
| Workers Compensation | Statutory |
| Employers Liability | |
|    Each Accident | $1,000,000 |
|    Disease – Policy Limit | $1,000,000 |
|    Disease – Each Employee | $1,000,000 |

**Performance Bond:** Not Applicable

**Professional Liability:** Not Applicable

# EXHIBIT "B"

**CARSON CORPORATION**

171 Route 94 North
Lafayette, NJ 07848
Ph: (973) 579-4100
Fax: (973) 579-4105

### Change Order Request/Additional Work Order Summary

| | |
|---|---|
| Customer: | Precision Pipeline, LLC |
| Project: | River Pipeline - Wolf Creek (A) HDD |
| Project #: | 6232 |
| Subcontract #: | |
| Date of Work: | |

| | |
|---|---|
| Submitted by: | Scott Murray |
| Date Submitted: | May 3, 2017 |
| Accepted by: | |
| Converted to: | |
| Change Order | 1 |

| AWA # | Description of Work : | QTY | UNIT | Cost for Labor | | Cost for Materials | | Other / Equipment | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Unit Cost | Total Cost | Unit Cost | Total Cost | Unit Cost | Total Cost |
| N/A | Mud Disposal | | | | | | | | |
| | Mud Disposal @ $250 per lf | 1750 | LF | $ - | $ - | $ - | $ - | $ 250.00 | $ 437,500.00 |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | Sub-Total | $ - | | $ - | | | $ 437,500.00 |

| | |
|---|---|
| Total Labor | $0.00 |
| Total Materials | $0.00 |
| Total Equipment | $437,500.00 |
| Subtotal | $437,500.00 |
| Overhead 0% | $0.00 |
| Subtotal | $437,500.00 |
| Insurance & Bonds 0% | $0.00 |
| Grand Total | $437,500.00 |

**CARSON CORPORATION**

171 Route 94 North
Lafayette, NJ 07848
Ph: (973) 579-4100
Fax: (973) 579-4105

**Change Order Request/Additional Work Order Summary**

| | |
|---|---|
| Customer: | Precision Pipeline, LLC |
| Project: | Rover Pipeline - Wolf Creek (A) |
| | HDD |
| Project #: | 6232 |
| Subcontract #: | |
| Date of Work: | |

| | |
|---|---|
| Submitted by: | Scott Murray |
| Date Submitted: | May 15, 2017 |
| Accepted by: | |
| Converted to: | |
| Change Order | 2 |

| AWA # | Description of Work : | QTY | UNIT | Cost for Labor | | Cost for Materials | | Other / Equipment | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Unit Cost | Total Cost | Unit Cost | Total Cost | Unit Cost | Total Cost |
| N/A | Night Shift Operation | | | | | | | | |
| | 24/7 Operation Charge | 1 | LS | $ 200,000.00 | $ 200,000.00 | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | Sub-Total | | $ 200,000.00 | | $ - | | $ - |

| | | |
|---|---|---|
| Total Labor | | $200,000.00 |
| Total Materials | | $0.00 |
| Total Equipment | | $0.00 |
| Subtotal | | $200,000.00 |
| Overhead | 0% | $0.00 |
| Subtotal | | $200,000.00 |
| Insurance & Bonds | 0% | $0.00 |
| Grand Total | | $200,000.00 |

# CARSON CORPORATION

171 Route 94 North
Lafayette, NJ 07848
Ph: (973) 579-4100
Fax: (973) 579-4105

## Change Order Request/Additional Work Order Summary

| | |
|---|---|
| Customer: | Precision Pipeline, LLC |
| Project: | Rover Pipeline - Wolf Creek (A) |
| | HDD |
| Project #: | 6232 |
| Subcontract #: | |
| Date of Work: | |

| | |
|---|---|
| Submitted by: | Scott Murray |
| Date Submitted: | June 15, 2017 |
| Accepted by: | |
| Converted to: | |
| Change Order | 3 |

| AWA # | Description of Work : | QTY | UNIT | Cost for Labor | | Cost for Materials | | Other / Equipment | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Unit Cost | Total Cost | Unit Cost | Total Cost | Unit Cost | Total Cost |
| N/A | Guard Work | | | | | | | | |
| | 4 Laborers for Guard Duty at each Entrance both shifts | 1 | Day | $ 3,900.00 | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | ** Total cost TBD | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | Sub-Total | | $ - | | $ - | | $ - |

| | | |
|---|---|---|
| Total Labor | | $0.00 |
| Total Materials | | $0.00 |
| Total Equipment | | $0.00 |
| Subtotal | | $0.00 |
| Overhead | 0% | $0.00 |
| Subtotal | | $0.00 |
| Profit | 0% | $0.00 |
| Grand Total | | $0.00 |

# EXHIBIT "C"

# APPLICATION AND CERTIFICATE FOR PAYMENT
*AIA DOCUMENT G702/CMa*

**CONSTRUCTION MANAGER-ADVISER EDITION**

PAGE ONE OF  1  PAGES

| | |
|---|---|
| TO OWNER:  Precision Pipeline, LLC<br>3314 56th Street<br>Eau Claire, WI 54703 | APPLICATION NO: 3-Change Orders |
| Wolf Creek (A) HDD | Distribution to:<br>☐ OWNER<br>☐ CONSTRUCTION MANAGER<br>☐ ARCHITECT<br>☐ CONTRACTOR |
| Attn:  Accounting<br>FROM CONTRACTOR:<br>Carson Corporation<br>171 Route 94<br>Lafayette, NJ  07848 | PERIOD TO: 08/01/17<br>CONTRACT #: |
| CONTRACT FOR: | VIA CONSTRUCTION MANAGER:<br>VIA ARCHITECT: |
| | CONTRACT DATE: |

## CONTRACTOR'S APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 2,365,200.00 |
| 2. Net change by Change Orders | $ | 813,000.00 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 3,178,200.00 |
| 4. TOTAL COMPLETED & STORED TO DATE<br>(Column G on G703) | $ | 2,646,030.00 |
| 5. RETAINAGE: | | |
| a.    0  % of Completed Work<br>(Column D + E on G703) | $        0.00 | |
| b.    0  % of Stored Material<br>(Column F on G703) | $        0.00 | |
| Total Retainage (Lines 5a + 5b or<br>Total in Column I of G703) | $ | 0.00 |
| 6. TOTAL EARNED LESS RETAINAGE<br>(Line 4 less Line 5 Total) | $ | 2,646,030.00 |
| 7. LESS PREVIOUS CERTIFICATES FOR<br>PAYMENT (Line 6 from prior Certificate) | $ | 1,833,030.00 |
| 8. CURRENT PAYMENT DUE | $ | 813,000.00 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE<br>(Line 3 less Line 6) | $ | 532,170.00 |

*Not paid*

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved<br>in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | $0.00 | $0.00 |
| NET CHANGES by Change Order | $0.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:         Carson Corporation

By: _____   Date: _____

State of:    NJ                                      County of:    Sussex
Subscribed and sworn to before me this                day of  .
Notary Public:
My Commission expires:

## CERTIFICATE FOR PAYMENT
In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Construction Manager and Architect certify to the Owner that to the best of their knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED        $    $813,000.00
*(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that changed to conform to the amount certified.)*
CONSTRUCTION MANAGER:
By: _____   Date: _____
ARCHITECT:
By: _____   Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702/CMa · APPLICATION AND CERTIFICATION FOR PAYMENT · CONSTRUCTION MANAGER-ADVISER EDITION · 1992 EDITION · AIA® · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1745 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292                                      G702/CMa-1992
Users may obtain validation of this document by requesting of the license a completed AIA Document D401 - Certification of Document's Authenticity

CONTINUATION SHEET

*AIA DOCUMENT G703*

PAGE 1 of 1 PAGES

AIA Document G702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: 3-Change Orders
APPLICATION DATE:
PERIOD TO: 08/01/17
CONTRACT NO:

Wolf Creek (A) HDD

| A | B | C | D | | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | Materials Previously Stored | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| 1 | Mobilization | 118,260.00 | 118,260.00 | | | - | 118,260.00 | 100.00% | - | - |
| 2 | Pilot Hole | 473,040.00 | 473,040.00 | | | - | 473,040.00 | 100.00% | - | - |
| 3 | Reaming | 1,182,600.00 | 1,182,600.00 | | | - | 1,182,600.00 | 100.00% | - | - |
| 4 | Pullback | 473,040.00 | - | | | - | - | 0.00% | 473,040.00 | - |
| 5 | Restoration/As-Builts | 118,260.00 | 59,130.00 | | | - | 59,130.00 | 50.00% | 59,130.00 | - |
| | | | | | | | | | | |
| | CONTRACT SUBTOTAL | 2,365,200.00 | 1,833,030.00 | - | | - | 1,833,030.00 | | 532,170.00 | - |
| | CHANGE ORDERS | | | | | | | | | |
| | Change Order #1 - Mud Disposal | 437,500.00 | - | | 437,500.00 | | 437,500.00 | 100.00% | - | - |
| | Change Order #2 - 24/7 Operation Charge | 200,000.00 | - | | 200,000.00 | | 200,000.00 | 100.00% | - | - |
| | Change Order #3 - Guard Duty 6/16-7/30/17 @$3,900 per day | 175,500.00 | - | | 175,500.00 | | 175,500.00 | 100.00% | - | - |
| | CHANGE ORDERS SUBTOTAL | 813,000.00 | - | - | 813,000.00 | - | 813,000.00 | | - | - |
| | CUMULATIVE TOTAL | 3,178,200.00 | 1,833,030.00 | - | 813,000.00 | - | 2,646,030.00 | 83% | 532,170.00 | - |

Users may obtain validation of this document by requesting of the license a completed AIA Document D401 - Certification of Document's Authenticity

AIA DOCUMENT G703 · CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA® · © 1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5232

G703-1992

Seneca County Clerk of Courts
Jean A. Eckelberry, Clerk
Legal Department
103 East Market Street, Suite 101
Tiffin, Ohio  44883

ADDRESS SERVICE REQUIRED



9414 7266 9904 2118 4017 29



U.S. POSTAGE >> PITNEY BOWES

ZIP 44883     $ 008.67⁰
02 4W
0000341878 JUN 14 2018

PRECISION PIPELINE LLC

Stat Agent: Corp Service Co
50 W Broad St, Ste 1330
Columbus              OH 43215